UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-10225-RGS

ROLAND G. HILL & MARY R. HILL

v.

EDWARD WALSH ET AL.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

June 29, 2017

STEARNS, D.J.

Plaintiffs Roland and Mary Hill (Roland and Mary) bring this civil rights action against the City of Taunton, its police chief, and several of its police officers, alleging that a search of their home in the course of executing a warrant of apprehension for their son, Matthew Hill, violated their rights under the Fourth Amendment. In due course, defendants moved for summary judgment. For the following reasons, the court will grant the motion.

BACKGROUND

Roland and Mary have lived at 3 Eldridge Street in Taunton for over twenty years. Matthew grew up in the family home, but by the time of the

events in suit, he had reached adulthood and was living on his own in an apartment on Weir Street in Taunton.

Matthew had struggled with drug addiction since his teenage years. In March of 2015, his drug use escalated and concerned family members felt the need for an urgent intervention. On March 3, 2015, Matthew's sister, Amanda Hill, called the Taunton police and 911 warning that Matthew was on the verge of an overdose. Taunton police officers responded to Matthew's Weir Street address and assisted his transport by ambulance to Morton Hospital in Taunton.

The following day, Amanda filed a petition in the Taunton District Court seeking to have Matthew committed as a substance abuser pursuant to Mass. Gen. Laws ch. 123, § 35. Amanda listed her parents' Eldridge Street home as Matthew's address, but also noted Morton Hospital as his current location. In response to the petition, a District Court Judge issued a warrant of apprehension for Matthew, which the statute authorizes "if there are reasonable grounds to believe that such person will not appear [for a commitment hearing] and that any further delay in the proceedings would present an immediate danger to the physical well-being of the respondent." *Id.* The warrant of apprehension issued at 2:20 p.m. and identified its subject as "Matthew Hill, 3 Eldridge Street, Taunton, MA 02780." Dkt #30-

14. In capital letter typeface below Matthew's name and address, the warrant stated "CURRENTLY AT MORTON HOSPITAL." *Id*. The standard-form warrant also stated in bold type that it could "not be executed unless the respondent can be brought before a judge prior to 4:30 P.M. on the same day that it is executed." *Id*.

The warrant was faxed to the Taunton police department at approximately 2:58 p.m., where it was received by the shift commander, defendant Joseph Marques. Marques examined the warrant, entered information from it into the department's dispatching system, and then gave the warrant to defendant Deborah Lavoie, a dispatcher. Lavoie passed the warrant on to defendant William Henault, who was the duty patrol supervisor. All three officers testified at their depositions that they did not see the reference to Morton Hospital on the face of the warrant.

Henault left the station to serve the warrant no later than 3:17 p.m. He arrived at the Eldridge Street address a few minutes later. Because Henault knew from past experience that several large dogs lived at the house, he shook the chain link fence surrounding the property to draw the attention of any dogs that might be loose in the yard. As he did so, Henault was joined by defendant officer Troy-Allen Enos, who had responded to a radio call from Lavoie requesting officer assistance in serving the warrant. Henault and

3

Enos went to the front door of the home and knocked, which caused the dogs inside to approach the door and begin barking. Receiving no human response to their knocks, the officers peered through sidelights next to the front door. Henault testified that he briefly saw what he believed to be a fleeting silhouette inside the home. Enos testified that he saw a curtain moving and what he thought to be a person inside the home.

The officers walked around the perimeter of the home, calling Matthew's name. As they did so, they discovered that a side door of the home was unlocked. The officers testified that they believed someone was inside the home, but that they were reluctant to enter because of the hostile dogs. Before they could act further, defendant Police Chief Edward Walsh arrived.

Henault explained the situation to Walsh: that they were attempting to serve a warrant of apprehension for Matthew; that he and Enos had been unable to definitively determine whether Matthew was inside the home; that there were aggressive dogs in the house deterring them from entering; and that he believed that he had seen the shadow of a person inside. Henault also told Walsh that the home belonged to Matthew's parents, and that Matthew had his own apartment on Weir Street. After receiving the briefing, Walsh instructed Henault to ask the dispatchers whether they had received any additional information about Matthew or the warrant. Henault spoke with

both Lavoie and Marques, who reported nothing further had been provided. After further discussion, the officers decided that Matthew was probably inside the home and potentially at grave risk of an overdose.

Walsh then instructed Enos to retrieve the fire extinguisher from his cruiser. Armed with the fire extinguisher, Walsh, Henault, and Enos entered the home through the unlocked side door. Walsh sprayed the fire extinguisher three times to drive the dogs back, enabling the officers to conduct a sweep of the premises. They found no one at home. Roland and Mary were forced to vacate the home for several days while cleaners removed the fire retardant residue.

Angry at the damage done to their home, Roland and Mary filed this lawsuit, asserting violations of the Civil Rights Act, 42 U.S.C. § 1983, by the officers and the City of Taunton, as well as common-law claims for intentional infliction of emotional distress and trespass against Walsh, Henault, and Enos. Following the completion of discovery, defendants moved for summary judgment, *see* Fed. R. Civ. P. 56, invoking the doctrine of qualified immunity. The court heard argument on the motion on May 31, 2017.

DISCUSSION

In evaluating a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving parties and draws all reasonable inferences in their favor. *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must demonstrate the absence of any real disputes of material fact in the summary judgment record. *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Cir. 2016). Where the nonmovants bear the burden of proof on an issue, they must respond by "adduc[ing] specific facts showing that a trier of fact reasonably could find in [their] favor." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 83 (1st Cir. 2016). This showing must be based on competent evidence, *Flovac*, 817 F.3d at 853, and cannot consist merely of "[c]onclusory allegations, improbable inferences, and unsupported speculation," *Warren Pumps*, 821 F.3d at 83.

I. Qualified Immunity

The officer defendants seek qualified immunity, which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity requires two separate inquiries. First, the court looks at "whether the plaintiff's version of the facts makes out a violation of a protected right." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017). Second, the court examines whether the right was clearly established at the time of the violation. *Id.* The court need not address these questions sequentially, but can take the most efficient route permitted by the undisputed facts. *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015).

Defendants frame their argumentation on both prongs of the inquiry. They first maintain that the search did not violate Roland and Mary's Fourth Amendment rights. Second, they contend that even if they were mistaken in a constitutional sense in entering the home, their entry did not violate clearly established law.

The court begins with first principles. The home is the *sanctum sanctorum* of Fourth Amendment law, such that "warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions." *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004). Defendants do not contend that the warrant of apprehension authorized them to enter Roland and Mary's

7

home, but rather that they acted reasonably under the exigent circumstances and special needs exceptions to the warrant requirement, as well as pursuant to the community caretaking doctrine.

This case begins (and ends) with the exigent circumstances doctrine. Under this doctrine, officers may conduct a warrantless search when they face "a 'compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant.'" *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995), quoting *United States v. Wilson*, 36 F.3d 205, 209 (1st Cir. 1994). A subset of this doctrine is the so-called "emergency aid" exception, which allows a warrantless entry based on "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see Commonwealth v. Kaeppeler*, 473 Mass. 396, 401-402 (2015); *Commonwealth v. Entwistle*, 463 Mass. 205, 213-214 (2012). To invoke this exception, "the government must show a reasonable basis, approximating probable cause, both for the officers' belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude."[1] *United States v. Martins*, 413

---

[1] The "approximating probable cause" qualifier is open to question in light of the Supreme Court's subsequent emergency aid decisions, although the First Circuit has yet to revisit this standard. *See United States v. Almonte-Báez*, 857 F.3d 27, 31 & n.3 (1st Cir. 2017) (citing *Martins* for the proposition that the emergency aid doctrine requires a showing of probable

F.3d 139, 147 (1st Cir. 2005). This analysis is conducted "in light of the totality of the circumstances confronting the officers, including, in many cases, a need for on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences." *Id.* The court is to consider "the objective facts reasonably known to, or discoverable by, the officers at the time of the search." *Tibolt*, 72 F.3d at 969.

Roland and Mary seize on the argument that the officers should have known from the typewritten insert on the warrant of apprehension that Matthew was "currently at Morton Hospital." Given that information, Roland and Mary say, no reasonable officer could have believed that Matthew was in the home.

---

cause); *United States v. D'Andrea*, 648 F.3d 1, 11 (1st Cir. 2011) (observing in an emergency aid case that "exigent circumstances is an exception to the warrant, not the probable cause, requirement"). In both *Brigham City* and *Michigan v. Fisher*, 558 U.S. 45 (2009), the Supreme Court did not invoke probable cause in approving entries pursuant to the emergency aid doctrine, instead speaking solely in terms of reasonableness. *See Fisher*, 558 U.S. at 49 ("It sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher had hurt himself . . . or that Fisher was about to hurt, or had already hurt, someone else."). Relying on these cases, the Massachusetts Supreme Judicial Court has held that probable cause is not a necessary component of the emergency aid doctrine. *See Commonwealth v. Duncan*, 467 Mass. 746, 750 (2014); *Entwistle*, 463 Mass. at 214-215.

The court disagrees. Even if the officers should have seen the notation, that fact alone would not have made it unreasonable for them to travel to the 3 Eldridge Street address to search for Matthew. The warrant of apprehension listed the subject of the warrant as "Matthew Hill, 3 Eldridge Street, Taunton, MA." The Morton Hospital notation indicated only that Matthew was believed to be at the hospital at the time Amanda filed the warrant application.[2] Although the gap in time between the filing of the application, the issuance of the warrant, and its attempted execution was relatively short, Matthew might well have departed the hospital, unknown to the court or to his sister. The reasonableness of the decision to travel to the home is reinforced by the time constraints the officers faced: the police did not receive the warrant until shortly before 3 p.m., but knew that it had to be promptly executed so that Matthew could be "brought before a judge prior to 4:30 P.M. on the same day." Dkt #30-14. Fruitless efforts to locate Matthew at Morton Hospital would have further reduced the window for a timely execution of the warrant, placing his safety at greater risk. In hindsight, a reasonable officer might well have taken a preliminary step to ascertain whether Matthew was still at Morton Hospital, but that would have been a

---

[2] Under the statute, a civil commitment order for an alcoholic or drug addict can be requested by "[a]ny police officer, physician, spouse, blood relative, guardian, or court official." Mass. Gen. Laws ch. 123, § 35.

matter of discretion, given the two possible locations for Matthew indicated on the warrant.3

As the initial decision to proceed to 3 Eldridge Street was reasonable, the focus turns to the reasonableness of the entry of the home after the officers' arrival. What followed is a textbook example of the emergency aid doctrine. The officers went to the home based on a court order finding that "any further delay in the [commitment] proceedings would present an immediate danger to [Matthew]'s physical well-being." Dkt #30-14. This concern was compounded by the limited timeframe available to the officers to serve the warrant before the court closed. The court order also informed the officers that the court had determined that Matthew "will not appear upon summons," Dkt #30-14, and the officers' observations at the house were consistent with that finding: Henault and Enos both testified that they believed they saw someone in the home who was not responding to their knocks and acting furtively. In addition, Henault and Enos determined that the side door to the house was unlocked, which would be unusual if no one was at home.

---

3 This conclusion suffices to carry the summary judgment day for defendants Marques and Lavoie, who are charged solely with failing to observe the notation and, thus, causing an unreasonable search by directing the other officers to the Eldridge Street address.

To be sure, the most critical part of this account — the officers' assertion that they observed indications that someone was in the home — relies solely on their own testimony. No witness could otherwise contradict their claim, given that no other person was present. But even in these circumstances, "summary judgment . . . must be granted absent a genuine dispute as to a material issue."[4] *Hegarty v. Somerset County*, 53 F.3d 1367, 1376 n.6 (1st Cir. 1995). Roland and Mary point to several alleged contradictions in the officers' account in an effort undermine their testimony, but none are availing. First, they say that Henault's knowledge, communicated to Walsh, that Matthew lived on Weir Street demonstrates that the officers could not have had a reasonable belief that Matthew was at his parents' home. This position is bolstered, they contend, by the fact that the officers knew or should have known that other officers had assisted Matthew's transport to Morton Hospital from Weir Street the night before. Yet the officers were in possession of a court order for Matthew's apprehension that linked him to the 3 Eldridge Street address. It was also

---

[4] Courts sometimes apply a more rigorous standard of scrutiny to cases where officers are the only witnesses (typically excessive force cases brought by the estates of individuals killed in police shootings). *See Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015) (collecting cases). As the following discussion indicates, however, Roland and Mary have failed to create a genuine question of material fact even under that more exacting inquiry.

not unreasonable for the officers to believe that a child in distress might likely seek refuge with his parents. Moreover, as already noted, the Morton Hospital notation was not dispositive of the reasonableness of the officers' decision to go to the home in the first place. Thus, any disputed facts surrounding the officers' knowledge on these collateral matters are not material to the summary judgment decision.

Second, Roland and Mary argue that Enos's assertion that he believed he saw someone in the home is questionable because Henault and Walsh do not recall Enos communicating that information to them. The deposition testimony taken as a whole, however, belies this argument. Henault testified that he and Enos conferred and concluded that they believed someone was in the house — a statement entirely compatible with Enos's testimony that he told Henault that he thought he saw a person inside. *See* Dkt #36-6 at 35; Dkt #36-12 at 21. Moreover, neither officer testified that Enos relayed his observation to Walsh. The fact that Walsh did not recall Enos saying anything, Dkt #36-12 at 21, and his failure to include Enos's observation in his report, thus come as no surprise.[5]

---

[5] Roland and Mary also suggest that Henault's testimony is unreliable because he claims to have perceived a silhouette despite the presence of barking, menacing dogs jumping at the window. Not only does this argument call for weighing the credibility of a witness — forbidden at the summary judgment stage, *see Ahmed v. Johnson* 752 F.3d 490, 495 (1st Cir.

13

Third, Roland and Mary argue that Walsh's statement in his police report that dispatch was "urgently" seeking execution of the warrant is contradicted by a the passive tone of a recording of the dispatch call. Dkt #37-16; Dkt #36-9 at 84. Yet Walsh's characterization of the call in his report does not alter the objective and undisputed facts about the reasonableness of the officers' decision to enter the home. The late hour of issuance of the warrant and the time constraints it set out reasonably lent themselves to a sense of urgency; the fact that Walsh, in a report written weeks later, inaccurately attributed that urgency to communications from the dispatcher is immaterial.

In sum, on the undisputed facts, the officers are entitled to summary judgment on the § 1983 claims under the emergency aid exception.[6]

---

2014) — but it has no basis in Henault's testimony. Henault stated that he was startled by a dog leaping at the window, backed away, and then peered in a second time. It was during this second look that he believed he glimpsed the silhouette. Dkt #36-6 at 34.

[6] Even if the officers committed a Fourth Amendment violation by entering the home, they would have a strong case under the "clearly established" prong of the qualified immunity analysis. One Court of Appeals has concluded that there is no clearly established Supreme Court precedent governing whether a similar civil warrant for an alcoholic in danger of harming himself establishes exigent circumstances to search a third party's home, see *Bates v. Harvey*, 518 F.3d 1233, 1249 (11th Cir. 2008), and no First Circuit precedent provides definite guidance either way. Similarly, the search here bears similarity to the special needs search under an analogous civil commitment regime for the mentally ill persons endorsed as compliant

II. Other Claims

In light of the court's conclusion that no Fourth Amendment violation occurred, Roland and Mary's other claims also fail. First, their claim against the City of Taunton under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), cannot survive without a Fourth Amendment violation to ground it. *See, e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Second, setting aside their factual insufficiency, the state-law claims for trespass and intentional infliction of emotional distress against Henault, Enos, and Walsh are barred by common-law immunity. A public official enjoys immunity from liability for intentional torts under Massachusetts law when he acts "in good faith, without malice, and without corruption." *Nelson v. Salem State Coll.*, 446 Mass. 525, 537 (2006). So it is here: the record contains no evidence of bad purpose or malice, and indeed, Roland and Mary admit they can identify no motive for the officers' search other than the failed attempt to locate and rescue Matthew.

---

with the Fourth Amendment in *McCabe v. Life-Line Ambulance Service, Inc.*, 77 F.3d 540 (1st Cir. 1996). Finally, if the officers acted reasonably, but without meeting the "approximating probable cause" standard, the apparent split between the Massachusetts Supreme Judicial Court and the First Circuit over the showing required under the emergency aid exception, *see supra* note 1, would by itself entitle the officers to qualified immunity, *see Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 143-145 (1st Cir. 2001) (holding that conflicting rulings from the relevant state high court and the First Circuit bar a conclusion that the law is clearly established).

ORDER

For the foregoing reasons, defendants' motion for summary judgment (Dkt #30) is <u>GRANTED</u>.  The clerk is directed to enter judgment for the defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE